```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
RICHARD E. STONE,                        :
                      Plaintiff,         :
                                         :        05 Civ. 10896 (DLC)
          -v-                            :
                                         :        OPINION AND ORDER
THE NEW YORK PUBLIC LIBRARY, ASTOR,      :
LENOX, AND TILDEN FOUNDATIONS,           :
                      Defendant.         :
                                         :
----------------------------------------X
```

Appearances:

Plaintiff Richard E. Stone, Pro Se:
535 W. 23rd St., #4LS
New York, NY 10011

For Defendant New York Public Library, Astor, Lenox, and Tilden Foundations:
Jean L. Schmidt
Thelen Reid Brown Raysman & Steiner LLP
900 Third Avenue
New York, NY 10022

DENISE COTE, District Judge:

Plaintiff Richard E. Stone ("Stone" or "plaintiff"), proceeding pro se, brought this action under Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, et seq., which guarantees individuals full and equal enjoyment of places of public accommodation without race-based discrimination. Stone alleges that employees of the New York Public Library, Astor, Lenox, and Tilden Foundations ("NYPL" or "defendant") treated him in a racially discriminatory manner on at least four occasions. NYPL filed a motion to dismiss, which was denied in

a Memorandum Opinion dated August 2, 2006.  <u>Stone v. New York Pub. Library</u>, No. 05 Civ. 10896, 2006 WL 2167257 (S.D.N.Y. Aug. 2, 2006).  Following the completion of discovery, NYPL filed the instant motion for summary judgment.  The defendant's summary judgment papers, which were served on the plaintiff, included a Local Rule 56.2 Notice to Pro Se Litigants Opposing Summary Judgment, which advised Stone of his burden of submitting evidence to oppose summary judgment.  Stone has filed an affirmation in opposition to the motion based solely upon allegations regarding the conduct of discovery.  For the following reasons, the motion for summary judgment is granted.

BACKGROUND

Stone's Title II claim is premised upon allegations regarding several incidents that took place at various branches of the NYPL.  His compliant, filed in October 2005, referenced four such incidents, each of which took place at the Mid-Manhattan Branch; in his opposition to the defendant's motion to dismiss and during his deposition on July 24, 2007, Stone identified at least two additional incidents.  Each will be briefly described here.

On October 8, 2004, Stone, who is black, claims that a "deranged old white male" approached him while he was speaking to a librarian at the Mid-Manhattan Branch of the NYPL.  Stone

spoke to the individual in an effort to "calm him down," and raised his voice in order "to try to talk over him." The librarian told Stone to keep his voice down, and she called security. By the time the security officers arrived, the "white male" had fled the scene, and the librarian told security that Stone was to blame for the incident, and that he should be escorted out if he did not calm down. Stone was not escorted out, however. Stone spoke to a security officer after the incident, who told him that the librarian "has an attitude anyway" that the officer "thinks is based on race." Stone has alleged that the actions taken by the librarian were racially discriminatory, in light of what he was told by the security officer and because "she favored somebody who was obviously wrong."

On June 3, 2005, also at the Mid-Manhattan Branch, Stone alleges that at approximately 5:50 p.m. (ten minutes prior to closing time), a "young black female" turned off the computer that he was using without warning him that she would do so. Stone reported this incident to a supervisor, a white woman, who was "dismissive" of his complaint. At his deposition, Stone stated that he believed that the actions taken by both individuals during this incident "could be racially motivated" because "[w]hen it comes to certain people they feel that they don't have equal rights," and that they can "just dismiss your

3

complaints because they don't consider you worthy of taking any action." Specifically with regard to the actions taken by the "young black female," Stone testified that "[t]his is a social phenomenon . . . , to put it in street parlance, they dis their own men." With regard to the supervisor's actions, Stone also stated that "she seemed zombiatic," and that "maybe she didn't like her job, that is not an easy job."

On June 9, 2005, at approximately 7:38 p.m., Stone was waiting on line to check several videos out of the library. Although Stone was in the front of the line, the clerk, an Asian woman, called forward for service a white woman who was standing behind him. Stone testified that this clerk had been rude to him previously -- i.e., "she would take her time calling you over to be serviced, and then while you were being serviced she would service you so rapidly, like you are a disease" -- and that he "didn't want her to wait on [him] anyway." He further testified that he was not an "aggressive" person who stepped forward as soon as a clerk appeared to be available, but rather that he is a person who waits for an indication from the clerk that they are ready to serve the next customer. Stone has alleged that the clerk's actions in this instance were racially motivated because "it didn't make any sense, it was improper, it

was not logical, it was not reasonable." Stone reported this incident to a security officer, but he took no action.[1]

On January 17, 2006, at approximately 5:50 p.m. (ten minutes prior to closing time), at the Jefferson Market Branch, Stone alleges that a clerk left him waiting to be served while she discussed personal business with a co-worker. When she finally processed his transaction, she did so "so fast and brushed [Stone] to the side so that she could take care of a 'white' lady swiftly," and did not allow Stone time to gather his possessions. Stone testified, "I thought that that was rude and racially motivated because she was rushing me out of the way so she could deal with the white lady." Again, Stone reports, he informed a supervisor about this incident, but he took no action. With regard to the racial motivation of the supervisor, Stone testified that "I am satisfied that [he was racially motivated] because there is no other reason why."

On April 3, 2006, at 8:48 p.m. (twelve minutes prior to closing time), Stone was standing in line when a white man entered the room and walked straight up to the clerk's desk, thereby cutting ahead of him in line. Stone did not say anything until the man had finished his transaction, after which he told him that he "should have waited in line." Stone alleges

---

[1] In the complaint, Stone also alleged that "a similar occurrence" took place on November 22, 2004, at a different branch of the NYPL.

that the clerk "saw me in line" but "took the white guy over me who was not even in line."

Finally, Stone testified that in 2005 and 2006 he went to branches of the NYPL several times a week, but went less frequently in 2007. He testified that this was due to the fact that (1) he "could be injured by crazy people," or catch diseases from other patrons or the unsanitary conditions in the restrooms, (2) the "grittiness" of New York is particularly prevalent in "places where the public has access," and (3) "some of the staff are very, very rude" and "not very efficient." He also stated that "I don't believe that it is [the NYPL's] policy to discriminate, but I believe that the way they investigate and adjudicate" complaints "leaves much to be desired, and may actually encourage discrimination because [NYPL employees] realize they don't have to be identified."

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the

non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has asserted facts showing that the non-movant's claims or defenses cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; accord Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment.  Anderson, 477 U.S. at 248.  Finally, in applying these standards here, it should also be noted that plaintiff Stone is proceeding pro se, and that this Court has an obligation to read his submissions liberally and interpret them to raise the strongest arguments that they suggest.  See, e.g., Wright v. Comm'r, 381 F.3d 41, 44 (2d Cir. 2004).

Stone's claim is premised upon Title II of the Civil Rights Act of 1964, which provides that

> [a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

7

42 U.S.C. § 2000a(a). "[T]he overriding purpose of Title II [was] 'to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public.'" Daniel v. Paul, 395 U.S. 298, 307-08 (1969) (citing H.R. Rep. No. 88-914). It is not disputed that branches of the NYPL are places of public accommodation under the statute.

The Court of Appeals has indicated that § 2000a claims may be analyzed using the framework established for claims under 42 U.S.C. § 1981. Lizardo v. Denny's, Inc., 270 F.3d 94, 106 (2d Cir. 2001). Thus, in determining whether to grant summary judgment on Stone's claims here, it is appropriate to apply the McDonnell-Douglas burden-shifting analysis. Id. at 103; Gant ex rel. Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999) (§ 1981). See generally McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this approach, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004). A plaintiff's burden in presenting prima facie evidence of discriminatory treatment is "minimal," McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006), but the required showing includes the identification of "circumstances giving rise to an inference of discrimination on the basis" of race. McLee v. Chrysler Corp., 109 F.3d 130,

134 (2d Cir. 1997). "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." Lizardo, 270 F.3d at 101 (citation omitted).

If the plaintiff succeeds in making this prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason that motivated the adverse action or, in the § 2000a context, the denial of access to the public accommodation in question. McPherson, 457 F.3d at 215-16. The defendant's burden is "one of production, not persuasion." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the defendant meets this burden, the presumption of discrimination that arises from the plaintiff's prima facie showing "disappear[s]," and the plaintiff must then carry his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against" him. Reeves, 530 U.S. at 143. Under this framework, the defendant will thus "be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). "The court must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading

9

the fact-finder . . . that defendants intentionally discriminated against them on the basis of their race." Lizardo, 270 F.3d at 103 (§ 1981); see also id. at 106 (noting that these standards apply to § 2000a claims). "Whether summary judgment is appropriate . . . depends upon 'the strength of the plaintiff['s] prima facie case, the probative value of the proof that the [defendant's] explanation is false, and any other evidence' that supports the defendant['s] case." Id. at 103 (quoting Reeves, 530 U.S. at 148-49).

Finally, as noted in the August 2, 2006 Memorandum Opinion, a private individual may only obtain injunctive relief in a suit brought under Title II. See Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 86 (2d Cir. 2004) (citing Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 (1968)). Thus, to prevail on his § 2000a claim, Stone must also show a "real or immediate threat that [he] will be wronged again -- a 'likelihood of substantial and immediate irreparable injury.'" City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)).

It should be noted at the outset that Stone has not alleged that he was denied access to or use of any library books, facilities, or services, or that he was ever asked to leave a library, and Stone remains a frequent visitor to various branches of the NYPL. Rather, Stone's allegations are based

10

upon several instances in which he felt that he was given inefficient, discourteous, dismissive, or otherwise unfair treatment by library staff.  In certain of these instances, he has identified individuals of another race who he believes received better treatment; in other instances, he has testified that the actions in question were simply irrational, and must have been racially motivated for that reason.

We will assume, without deciding, (1) that the allegations and testimony contained in the complaint and provided at Stone's deposition satisfy his "minimal" burden of establishing a prima facie case of discrimination, McPherson, 457 F.3d at 215, and (2) that the delayed and discourteous service described above, if racially motivated, would be actionable under Title II. Defendant NYPL has, in turn, satisfied its burden of producing legitimate, non-discriminatory explanations for the actions taken. Reeves, 530 U.S. at 142.  With regard to the October 8, 2004 incident, the defendant notes that Stone admitted to raising his voice in speaking with the "deranged white male," and argues that no action was taken against that individual not because he was white, but because he had already left the scene by the time the security officer arrived.  With regard to the June 3, 2005 incident, Stone acknowledged that it was nearly closing time when the computers were shut down, and the complaint itself states that the proffered reason for this

11

action was that the worker "just wanted to go home."  The actions of June 9, 2005 -- calling forward a white patron for service who was behind him in line -- were taken not because of Stone's race, defendant argues, but because of the previous interactions between the clerk and Stone, and the fact that (as Stone concedes) he did not want to be serviced by her in any event.  On April 3, 2006, when defendant alleges that a white man cut him in line, Stone testified that he had not stepped forward to be served, that he did not say anything to either the clerk or the white man as the event was occurring, and that the white man "didn't realize that I was standing there."  Finally, the defendant also notes that nearly all of the alleged incidents took place only a few minutes before the library was scheduled to close, when staff members would naturally be hurried in their work.

Stone has offered no evidence in opposition to establish that these reasons are pretextual or "that reasonably supports a finding of prohibited discrimination."  Joseph, 465 F.3d at 90.  While, "[o]f course, direct evidence of discrimination is not necessary," and successful claims of racial discrimination are often premised upon circumstantial evidence, a plaintiff cannot simply "cite to their mistreatment and ask the court to conclude that it must have been related to their race."  Lizardo, 270 F.3d at 104.  Thus, Stone's assertions and intuitions regarding

the possible motivations of the NYPL's employees are not sufficient at this stage.[2] In addition, although Stone has pointed to a security guard's speculation that the employee involved in the October 8, 2004 incident had a racially biased attitude, he has not offered any evidence of how that opinion was formed so that its reliability can be assessed. Similarly, while Stone has given several examples of NYPL employees providing favorable treatment to white visitors -- e.g., calling a white woman to the checkout counter before him, allowing a white man to cut him in line -- he testified that he does not believe that the NYPL discriminates as a matter of policy or general practice, and, again, he has not indicated that he possesses any evidence that these particular events were, in fact, racially motivated and not explained by the facts and circumstances identified by the NYPL.

Finally, the alleged conduct is not the kind of "'markedly hostile' treatment [that] provides circumstantial evidence of [an] intent to discriminate" without reference to the treatment of other patrons. Lizardo, 270 F.3d at 102 (citation omitted). "Although mistreatment by" NYPL employees "is not irrelevant in assessing the strength of [Stone's] circumstantial evidence of

---

[2] It is appropriate to refer to the "possible motivations" of the employees, as the plaintiff himself recognized during his deposition that there might be other explanations for the conduct in question, such as the fact that the clerks and supervisors have difficult jobs.

race-based animus, it is certainly not sufficient to establish it," and, viewed in context, may "simply be yet another example of the decline of civility" in modern life. Id. As the Court of Appeals held in Lizardo, the "failure to greet customers [at a restaurant] on an extremely busy evening and an exasperated -- even testy -- response to a complaint of discrimination do not constitute marked hostility as defined, nor are they conduct which should be presumed to have its origins in racial bias." Id. Likewise, the conduct at issue here -- allowing Stone to be cut in line or serving the person behind him first in the final minutes before closing -- is not "so arbitrary on [its] face" that a jury could conclude that such conduct, by its very nature, provided circumstantial evidence of racial discrimination. Id. (citation omitted).

In sum, while "no action is more contrary to the spirit of our democracy and Constitution" than racial discrimination in places of public accommodation, Daniel, 395 U.S. at 306 (quoting President Kennedy), Stone has not submitted any evidence creating a genuine factual dispute regarding whether he was given unequal access to or "enjoyment of" NYPL services on account of his race. 42 U.S.C. § 2000a(a). Because it is apparent that Stone cannot "carry [his] ultimate burden of showing that [he was] denied services based upon [his] race,"

14

summary judgment must be granted to the defendant. Lizardo, 270 F.3d at 106.

Stone's affirmation in opposition to the defendant's motion does not contest any of the factual submissions or legal claims made by the defendant, but rather is limited to allegations regarding the discovery process. These allegations principally concern the conduct of depositions, during which Stone alleges that the defendant called "unscheduled" witnesses, swore in witnesses out of his presence, and failed to produce requested witnesses. These claims, however, have already been addressed and rejected by Magistrate Judge Pitman in an Order dated November 2, 2007, which denied Stone's request for a discovery extension on these grounds. In the November 2 Order, Judge Pitman noted that the plaintiff had already been provided two discovery extensions, and had "abused the discovery opportunities" he had been given. Stone did not object to this Order,[3] and the record submitted by the defendant in reply to Stone's affirmation indicates that such an objection would have been overruled in any event.[4] In sum, the allegations contained

---

[3] Stone did file, on November 27, 2007, a motion seeking the disqualification of Judge Pitman. This motion has not yet been addressed by Judge Pitman, but is rendered moot by this Opinion.

[4] Stone also avers in opposition that the transcript of his deposition cannot be accepted for evidentiary purposes because it was not certified by the court reporter. The copy of the transcript provided in connection with the defendant's summary judgment motion did not contain a certification signature, but,

in Stone's affidavit do not provide a basis for denying defendant's summary judgment motion.

CONCLUSION

Defendant's motion for summary judgment, filed on November 5, 2007, is granted. The Clerk of Court shall enter judgment for the defendant, terminate all pending motions as moot, and close the case.

SO ORDERED:

Dated:   New York, New York
         April 22, 2008

                                    _____
                                              DENISE COTE
                                     United States District Judge

---

in reply, the defendant has provided the certification page, signed by the court reporter on the day of Stone's deposition.

COPIES MAILED TO:

Richard Stone  
535 West 23rd Street, Apt. #4LS  
New York, NY 10011

Jean L. Schmidt  
Thelen, Reid, Brown, Raysman &  
Steiner LLP  
900 Third Avenue  
New York, NY 10022